# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 22-335V

```
* * * * * * * * * * * * * * * * * * * * * * * * *
CHARLES TAYLOR,                      *        Chief Special Master Corcoran
                                     *
              Petitioner,            *        Filed:  July 8, 2025
                                     *
       v.                            *
                                     *
SECRETARY OF HEALTH AND              *
HUMAN SERVICES,                      *
                                     *
              Respondent.            *
                                     *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

*Elizabeth K. Abramson,* mctlaw, Washington, DC, for Petitioner.

*Emily Hanson,* U.S. Dep't of Justice, Washington, DC, for Respondent.

### DAMAGES DECISION[1]

On April 4, 2021, Charles Taylor filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleged his receipt of an influenza ("flu") vaccine on October 5, 2020, caused him to suffer Guillain-Barré syndrome ("GBS"). Petition (ECF No. 1) at 5. I ruled on the record for entitlement in Petitioner's favor. *See* Ruling on Entitlement, filed Mar. 25, 2025 (ECF No. 56) ("Entitlement Ruling").

The parties were unable to resolve damages on their own and have therefore submitted their dispute to me for resolution (which solely involves the magnitude of the actual pain and suffering award). *See* Petitioner's Brief, filed Apr. 4, 2025 (ECF No. 59) ("Br."); Respondent's

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

Opposition, filed Apr. 14, 2025 (ECF No. 60) ("Opp."); Petitioner's Reply, filed Apr. 15, 2025 (ECF No. 61) ("Reply").

For the reasons set forth in greater detail below, **I find that Petitioner is entitled to an award of damages in the amount of $130,000.00** for actual pain and suffering.

## I.    Factual Background

A more complete summary of the relevant medical history and factual background is contained in my Entitlement Ruling, and is incorporated by reference herein. *See generally* Entitlement Ruling at 2–5.

In short, Petitioner received the subject flu vaccine on October 5, 2020. Ex. 1 at 1. A week later, he sought treatment for left shoulder pain which he attributed to working on his cabin. He was diagnosed with tendonitis, treated, and discharged. Ex. 5 at 5–10. Then, on October 15, 2020, Petitioner presented to his primary care provider at the Columbia University Student Health Center with "fatigue, headaches, tingling in his hands, feet, and mouth, and generalized weakness." Ex. 2 at 43.

The next day (specifically the evening of October 16, 2020) Petitioner reported to the emergency room with increased shoulder pain and range of motion issues, which were then attributed to Petitioner lifting his young daughter and doing heavy chores. Ex. 3 at 7–8. An exam revealed no neurological concerns, and he was diagnosed with a rotator cuff injury and given a steroid shot. *Id*. at 8, 18. His shoulder pain continued, however, and he began to experience other possibly neurologic symptoms. On October 19, 2020, Petitioner contacted his PCP regarding his previously reported hand and feet paresthesia, worsening weakness, and difficulty climbing stairs and getting out of bed. Ex. 2 at 27, 30, 33. Petitioner himself questioned whether these symptoms were rooted in a neurologic issue. *Id*. at 33.

On October 21, 2020, Petitioner went to the emergency department of New York Presbyterian Hospital complaining of pain and weakness in his arms and neck, tingling in his hands and feet, and leg weakness that inhibited his movement. Ex. 4 at 35. He was admitted for further evaluation. *Id*. While in the ER, Petitioner fell to the floor and remained prone until he was found by treaters, leading them to designate him as a fall risk. *Id*. at 38. An initial neurology assessment noted that he had begun to experience right shoulder pain comparable to that in his left shoulder. *Id*. at 69. A neurologist confirmed diminished strength, reflexes, and gait abnormalities. *Id*. at 70–71.

During a more comprehensive neurologic exam on October 22, 2020, Petitioner's treating neurologists noted the progression of his paresthesias from fingertips and toes upwards, his temperature regulation difficulties, and excessive fatigue. Ex. 4 at 39. While Petitioner had previously experienced episodes of "excruciating back pain" and had reported several tick bites in 2020, he denied any pre-onset illness or infections. *Id*. at 39–40. A lumbar puncture and

cerebrospinal fluid analysis performed on October 22 revealed elevated proteins consistent with GBS, and an electromyogram ("EMG") and nerve conduction study were also consistent with (though not specific for) GBS. *Id*. at 45, 28. While testing revealed the presence of an active CMV infection, the infectious disease team opined that the infection was a latent reactivation and secondary to Petitioner's GBS. *Id*. at 49.

Petitioner began a three-day course of intravenous immunoglobulin ("IVIg") and neuropathic pain medications. Ex. 4 at 38, 158. He was discharged on October 25, 2020, with a diagnosis of GBS "likely in the setting of recent flu vaccine." *Id.* at 47, 49. He continued to experience common post-treatment GBS sequelae and made slow progress in recovery. Ex. 2 at 15, 19. By February 2021, Petitioner was still experiencing some range of motion limitations, weakness, and numbness, and was advised to expect symptoms to linger for six months or so from onset (meaning through spring 2021). Ex. 2 at 11–12. By April 2021, Petitioner felt he was "about 70% back to baseline." Ex. 4 at 12. He has since continued to bear the diagnosis of GBS, AIDP (acute inflammatory demyelinating polyneuropathy) variant. *Id*. at 25.

## II.    Parties' Arguments

As noted, the sole damages component in dispute is actual pain and suffering. Petitioner seeks $150,000.00, while Respondent argues for the lesser sum of $90,000.00.

### *Petitioner*

Petitioner notes that he began experiencing symptoms such as "headaches, numbness and tingling, weakness, and fatigue" within two weeks of his vaccination. Br. at 14 (citing Ex. 2 at 27, 43). Over the course of his five-day hospitalization, Petitioner underwent an MRI, lumbar puncture, electrodiagnostic studies, and three IVIg treatments. *Id*. Though he did not require inpatient or outpatient physical therapy, Petitioner did experience residual GBS symptoms for six months after his vaccination, including "weakness, discomfort, fatigue, and reduced endurance." *Id*.

To support his proposed demand, Petitioner offers two comparable cases where claimants received pain and suffering awards of $160,000.00. *See generally Gross v. Sec'y of Health & Hum. Servs*., No. 19-0835V, 2021 WL 2666685 (Fed. Cl. Spec. Mstr. March 11, 2021); *Robinson v. Sec'y of Health & Hum. Servs*., No. 18-0088V, 2020 WL 5820967 (Fed. Cl. Spec. Mstr. Aug. 27, 2020). The petitioner in *Gross* was diagnosed with GBS and required a five-day hospitalization with a five-day course of IVIg treatment, an EMG, and a lumbar puncture, though she declined outpatient physical therapy. *Gross*, 2021 WL 2666685 at \*4. That individual continued to experience "numbness, tingling, and difficulty with balance" for several months, though treaters were unable to conclusively rule out her preexisting conditions as the cause of the sequelae. *Id*. The *Robinson* petitioner required a six-day hospitalization involving an MRI, CT scan, two lumbar punctures, a five-day course of IVIg, and twenty outpatient physical therapy sessions to treat her GBS. *Robinson*, 2020 WL 5820967 at \*2–3. She was able to return to work three months after the

3

onset of her symptoms and experienced few symptoms thereafter, though her hospitalization and recovery interfered with her ability to care for her young children. *Id*. at \*6.

Petitioner suggests that his case resembles those of the referenced petitioners, noting that they all underwent MRIs, lumbar punctures, electrodiagnostic testing, and courses of IVIg. Br. at 14–15. He posits that his course of treatment was more similar to that of the *Gross* petitioner (five-day hospitalization, no outpatient physical therapy), but that the duration of his symptoms was more like the petitioner in *Robinson* (Petitioner feeling "70% back to baseline" six months post-onset compared to Robinson's return to work three months post-onset). *Id*. at 15. Petitioner acknowledges that his course of IVIg was shorter than those in either proposed comparable case, but adds that this is reflected in the lower proposed award. *Id*.[3]

In his reply brief, Petitioner criticizes the comparable cases offered by Respondent – in particular *Granville v. Sec'y of Health & Hum. Servs*., No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023). He argues that *Granville* should not be considered because it was "predicated on a now withdrawn damages decision." Reply at 4 (referencing *Geschwindner v. Sec'y of Health & Hum. Servs*., No. 17-1558V, 2022 WL 177372 (Fed. Cl. Spec. Mstr. Jan 28, 2022)). Petitioner also argues that his case is more severe than that of the petitioner in *Koonce v. Sec'y of Health & Hum. Servs.,* No. 21-1560V, 2024 WL 3567368 (Fed. Cl. Spec. Mstr. July 8, 2024) due to Petitioner's ongoing "substantial weakness," and that Petitioner's emotional distress makes his situation factually distinguishable from both *Koonce* and *Granville*. *Id*. at 7–8.

*Respondent*

Respondent argues for a lesser award of $90,000.00. Opp. at 1. He maintains that Petitioner had an "uncomplicated and short course and recovery" from GBS. *Id*. at 6. Petitioner was discharged to home after a four-day hospital stay and three-day course of IVIg, and was able to walk up four flights of stairs to his apartment and even travel from New York to Virginia to visit family. *Id*. Respondent distinguishes both *Robinson* and *Gross* from the instant case, arguing that Petitioner's illness was less severe. *Id*. at 6–8. The petitioner in *Robinson* experienced a "traumatic" hospitalization, enduring severe migraines and painful testing, and a "horrible" return home that involved three months of leave from work and significant ongoing symptoms. *Id*. at 7–8 (citing *Robinson*, 2020 WL 5820967 at \*4. The petitioner in *Gross* had significant "residual GBS

---

[3] Petitioner also proposes that yet another comparable case establishes a "'floor' for Program cases involving GBS" at $130,000.00. Br. at 12 (citing *Quirino v. Sec'y of Health & Hum. Servs*., No. 17-989V, 2025 WL 407117 (Fed. Cl. Spec. Mstr. Jan. 8, 2025) at \*8). But I do not endorse the idea that any damages determination – including my own – amounts to binding precedent (as opposed to a practice guideline). Thus, while I have often informed SIRVA claimants that cases involving surgery will more often than not justify a six-figure pain and suffering award, the individual circumstances of the case ultimately are what matters. *See, e.g., Richardson v. Sec'y of Health & Hum. Servs.*, No. 20-0674V, 2023 WL 6180813, at \*8 (Fed. Cl. Spec. Mstr. Aug. 16, 2023). Here too, although the alarming nature of GBS as a vaccine injury justifies a higher-than-usual pain and suffering award, the actual calculation of that award comes down to the specific circumstances of the case.

symptoms" that required an increase to her dose of gabapentin. Opp. at 8 (citing *Gross*, 2021 WL 2666685 at *4).

To support his preferred pain and suffering award, Respondent offers two cases involving comparably-moderate GBS injuries - *Koonce* (in which $70,000.00 was awarded) and *Granville* ($92,500.00). Opp. at 9. The *Koonce* petitioner was also discharged to home after a "relatively uncomplicated" hospital stay for GBS (four days in the hospital, lumbar puncture, and IVIg), and did not attend physical therapy. Opp. at 9 (citing *Koonce*, 2024 WL 3567368, at *4). And *Granville* involved a mild GBS injury that required a five-day hospitalization, a lumbar puncture, five IVIg treatments, six PT sessions, and one OT evaluation. *Granville,* 2023 WL 6441388, at *4.

## III.    Relevant Law

### A.    *General Principles in Calculating a Pain and Suffering Award*

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, and award not to exceed $250,000.00." Section 15(a)(4). There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").

Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cir. 1995)). I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And of course, I may rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims.

Although pain and suffering in the past was often determined based on a continuum, that practice was cast into doubt by a decision from several years ago. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead,

*Graves* assessed pain and suffering by looking to the record evidence and prior pain and suffering awards within the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards—it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

      B.    *Pain and Suffering Awards in GBS Cases*

Table claims alleging GBS after receipt of the flu vaccine are common in the "special processing unit" ("SPU")—the process used by OSM for resolving matters it reasonably anticipates are amenable to fast resolution or settlement. I therefore include herein some discussion of the kinds of pain and suffering awards obtained in such cases.

As of July 1, 2024, on nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering (49 cases), over $100,000.00 has been awarded in every case but one (and there only the slightly lesser sum of $92,500.00 was awarded). The first-quartile value is $155,000.00, the median is $165,000.00, the third-quartile value is $178,000.00, and the largest award was $192,500.00. *Holmberg v. Sec'y of Health & Hum. Servs.*, No. 21-1132V, 2024 WL 4607929, at *3–5 (Fed. Cl. Spec. Mstr. Oct. 7, 2024).

A consistent starting consideration in reaching these determinations is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[4] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021); *see also Castellanos*, 2022 WL 1482497, at *10 (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But not every GBS case is equally severe. Further details of the initial medical course are considered—including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is a petitioner's long-term course—as evidenced by out-patient therapies, neurology evaluation, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of

---

[4] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequela. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g.*, *id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

"The mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life—especially one as alarming and potentially life-altering as GBS—and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). However, a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and nor from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Finally, the injury's impact on a petitioner's personal circumstances, including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed), is properly taken into account as well. All of these factors are primarily gleaned from the medical records—although sworn statements and/or other evidence may also be considered, especially if they *supplement*, and do not contradict, the facts reflected in the medical records.

## ANALYSIS

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. I therefore analyze principally the severity and duration of Petitioner's injury. In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents and at hearing. I have also considered prior awards for pain and suffering issued in comparable cases, although I ultimately base my determination on the circumstances of *this* case.

The record shows that Petitioner, a 35-year-old graduate student with a history of migraine headaches and tick bites, presented multiple times between October 12 and October 19, 2020, with left shoulder pain, followed by "fatigue, headaches, tingling in his hands, feet, and mouth, and generalized weakness." Ex. 2 at 43. Each time, testing found no abnormal results and Petitioner was discharged. Thus, this is not a case in which Petitioner's suffering was clearly exacerbated by treatment errors or miscalculations about the nature of his injury. Instead, his progression and presentation was too nonspecific to identify its exact character.

7

On October 21, 2020, Petitioner was admitted to the hospital for a neurological workup. Ex. 4 at 35. Petitioner was thereafter hospitalized for five days and diagnosed with GBS after undergoing extensive testing, including a lumbar puncture and EMG/NCV study, and a three-day course of IVIg treatment that was not repeated later. *Id*. at 45–49. Petitioner was discharged on October 25, 2020, with a diagnosis of GBS "likely in the setting of recent flu vaccine" and prescriptions for gabapentin and Percocet. Ex. 4 at 47, 49; Pet. at 4.

The record further indicates that Petitioner continued to experience common post-treatment GBS sequelae after returning home (rather than any extreme post-illness sequelae). Ex. 2 at 19. His recovery progress was, however, relatively slow, and he continued to feel weakness and numbness and experience a limited range of motion though February 2021. *Id*. at 11. By April 2021, now six months after vaccination, he reported feeling "about 70% back to baseline." Ex. 4 at 12. Petitioner claimed that he was abstaining from physical therapy until the COVID-19 pandemic was "more controlled." Ex. 2 at 12. Petitioner, a graduate student, resigned from his freelance consulting job due to his inability to keep up with the workload on account of his GBS sequelae. Ex. 13. He found it difficult to run or to carry his daughter, and managed ongoing pain with over-the-counter medicines. Ex. 6 at 14.

Based on the foregoing, and considering the parties' written arguments, I find that Petitioner suffered a moderate GBS injury—although as a class, GBS injuries are distinguishable in their nature and overall severity from many other kinds of more discrete or mechanical Program vaccine injuries. *Gross*, 2021 WL 2666685, at *5. Petitioner's personal experience with his injury justifies a six-figure pain and suffering award, but less than the $150,000.00 requested by Petitioner.

The comparable pain and suffering determinations offered by Petitioner, while helpful, reflect distinguishable circumstances in their higher amounts. *Gross* is difficult to reconcile with the facts at hand because that petitioner's more severe ongoing symptoms may have had something to do with to a preexisting condition (and thus the added suffering that claimant experienced due to the intervening vaccine injury warranted a higher award). *Gross,* 2021 WL 2666685 at *5. And while the *Robinson* petitioner experienced a similar hospital stay duration, course of IVIg treatments, and inability to care for her children, her hospitalization was significantly more traumatic. *Robinson,* 2020 WL 5820967 at *2–6. That petitioner was in constant agonizing pain due to her treatments, which included a second lumbar puncture, and attended 20 sessions of physical therapy after discharge. *Id*. at *3–4. Mr. Taylor, in contrast, did not attend any physical therapy after discharge and did not report such excruciating pain. Ex. 2 at 12.

At the same time, Respondent's recommendation of $90,000.00 is too modest and does not give sufficient credence to the seriousness of GBS as a general matter, or to the facts of this specific case. Nor are Respondent's proposed comparables significantly more useful than what Petitioner has offered. The *Koonce* petitioner, for example, experienced a milder case of GBS, featuring decreased sensation in his extremities but not weakness or difficulty walking like Petitioner. 2024

WL 356768 at *1. The *Koonce* petitioner's GBS had also mostly resolved within a month of his vaccination, with Mr. Koonce having returned to regular exercises with only complaints of some numbness in his toes. *Id*. at *2. In contrast, Petitioner was still experiencing issues with his range of motion and weakness for more than six months after his vaccination.

The facts of *Granville* are more consistent with Petitioner's experience. That petitioner incurred a five-day hospitalization with five IVIg treatments, a lumbar puncture, and an MRI, after which she was discharged with some continual numbness and tingling in her hands and feet. *Granville*, 2023 WL 6441388 at *3. Her symptoms then continued for about seven months, during which she returned to work part-time and attended six physical therapy appointments, and she later represented that she felt "fully recovered" from her GBS. *Id*. at *3–4.

*Granville* does support the proposition that not every case of GBS warrants an award of more than $150,000.00 – especially ones involving a single hospitalization and otherwise short course. But as Petitioner has noted, the *Granville* award arose in part because the petitioner therein relied (as a comparable case) on the amount of the award granted in *Geschwindner* – a case in which the pain and suffering award was later *increased,* to $120,000.00, following a granted motion to vacate the original judgment due to ineffective assistance of counsel. *Geschwindner v. Sec'y of Health & Hum. Servs.,* No. 17-1558V, 2024 WL 938952 (Fed. Cl. Spec. Mstr. Feb. 5, 2024). As a result, the precise determination from *Granville* loses some of its heft as guidance.

Overall, then, I find that the most fair sum to award lies somewhere between Petitioner's demand and the corrected amount from *Geschwindner.* I therefore will award **$130,000.00** in actual pain and suffering in this case.

## CONCLUSION

Based on the record as a whole and arguments of the parties, I award Petitioner a lump sum payment of **$130,000.00** for past pain and suffering, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement. This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court SHALL ENTER JUDGMENT in accordance with the terms of this Decision.[5]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[5] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.